UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| IDAHO BUILDING AND CONSTRUCTION TRADES COUNCIL, AFL-CIO, and SOUTHWEST IDAHO BUILDING AND CONSTRUCTION TRADES COUNCIL, AFL-CIO, | Case No. 1:11-cv-00253-BLW **MEMORANDUM DECISION AND ORDER** |
| Plaintiffs, | |
| v. | |
| LAWRENCE G. WASDEN, in his official Capacity as ATTORNEY GENERAL FOR THE STATE OF IDAHO. | |
| Defendants. | |

**INTRODUCTION**

Plaintiffs Idaho Building and Construction Trades Council, AFL-CIO and the Southwest Idaho Building and Construction Trades Council, AFL-CIO (collectively "Trades Councils") are unincorporated associations comprised of local unions affiliated with the Building and Construction Trades Department, AFL-CIO, which represent building trade workers throughout southern Idaho.  *Clay Decl.* ¶ 2, Dkt. 2-2; *Moore Decl.* ¶ 2, Dkt. 2-3.  They exist for the purpose of advancing the interests of building trade

unions and their members, advancing generally the union sector of the construction
market, and improving working conditions for workers in the building trades. *Clay Decl.*
¶ 3, Dkt. 2-2; *Moore Decl.* ¶ 3, Dkt. 2-3.  In this suit against Idaho Attorney General
Lawrence G. Wasden, the Trades Councils challenge two recent amendments to Idaho's
Right-to-Work Act: the "Open Access to Work Act," codified as Idaho Code §44-2013,
and the "Fairness in Contracting Act," codified as Idaho Code §44-2012.  The Trades
Councils allege that both laws interfere with the rights created by the National Labor
Relations Act and are therefore preempted.

Both the Trades Councils and Wasden have filed cross-motions for summary
judgment.  In addition, Inland Pacific Chapter of Associated Builders and Contractors
("IPC ABC"), a construction industry trade association with members in Idaho, and the
National Right to Work Legal Foundation ("NRTW"), a nonprofit organization with a
mission of fighting compulsory unionism, have filed amicus briefs in support of the two
challenged statutes.  For the reasons set forth below, the Court will grant the Trades
Councils' Motion for Summary Judgment (Dkt. 31) and deny Wasden's Motion for
Summary Judgment (Dkt. 32).

## BACKGROUND

The first statute the Trades Councils challenge, the Open Access to Work Act,
applies to public works construction in Idaho.  It forbids state agencies and cities,
counties, school districts, and other political subdivisions from requiring contractors to
pay a specified wage scale or provide specified employee benefits to its employees for
work on public works projects in Idaho, except as may be required by federal wage laws

applicable to public works projects supported by federal funds.  It also prohibits Idaho government agencies from requiring contractors, subcontractors and suppliers to sign collective bargaining or other union agreements as a condition of bidding on or performing contracts for construction of public works projects.  The construction industry commonly refers to these types of agreements when used on a particular project as "project labor agreements."

The second statute, the Fairness in Contracting Act, is aimed at "market recovery programs."  Unions began adopting market recovery programs, also known as "job targeting programs," in the early 1980s to enable signatory employers to compete for "targeted" jobs.  Typically, unions carry out their market recovery programs by selecting projects to target and guaranteeing subsidies to union contractors who submit successful bids.  The purpose of the subsidies is to reduce the unionized contractor's labor costs while allowing the union to maintain its collectively-bargained wage scale on the job and secure additional employment opportunities for its members.  *Clay Decl.* ¶ 3, Dkt. 2-2; *Moore Decl.* ¶ 3, Dkt. 2-3.

All market recovery programs in Idaho are maintained through voluntary contributions, which are deducted from the gross earnings of workers represented by the unions that operate the programs.  *Clay Decl.* ¶ 11, Dkt. 2-2; *Moore Decl.* ¶ 5, Dkt. 2-3; *Oveson Decl.* ¶ 3; *White Decl.* ¶ 3.  In some instances, such contributions are paid directly by union members to the union.  *Moore Decl.* ¶¶ 5,6.  By allocating the contributions among all members, local building trade unions seek to spread the economic concessions over the entire union membership in an equitable fashion.  *Id.*

The Fairness in Contracting Act prohibits three types of conduct relating to job targeting programs by labor organizations and contractors in the competitive bidding process. Specifically, it prohibits (1) contractors and subcontractors from receiving any wage subsidy, bid supplement or rebate on behalf of its employees or from providing subsidies, bid supplements or rebates to its employees; (2) labor organizations from paying a wage subsidy or rebate to its members in order to subsidize a contractor or subcontractor; and (3) the use of any fund derived from wages collected by or on behalf of labor organizations to subsidize contractors or subcontractors in Idaho. A violation of the Fairness in Contracting Act carries substantial penalties: up to $10,000 for the first offense, $25,000 for the second, and $100,000 per violation for each additional offense. Any interested party, including any bidder, contractor, subcontractor, or taxpayer has standing to challenge any violation of the new act and entitles the challenger to an award of attorney's fees and costs in the event the challenge succeeds.

## ANALYSIS

The Trades Councils argue that both statutes are preempted under the NLRA. In passing the NLRA, Congress largely displaced state regulation of labor relations. *Golden State Transit Corp. v. City of Los Angeles* ("*Golden State II*"), 493 U.S. 103, 108 (1989). While the NLRA contains no statutory preemption provision, the Supreme Court has found that Congress implicitly mandated two types of preemption: *Garmon* preemption and *Machinists* preemption.

The first, *Garmon* preemption, precludes several kinds of state intrusions on the NLRA's "integrated scheme of regulation," including "potential conflict of rules of law,

of remedy, and of administration." *San Diego Bldg. Trades Council* v. *Garmon*, 359 U.S. 236 (1959).  Different dangers attend each conflict: (1) "[t]he danger from the first kind of conflict is that the State will require different behavior than that prescribed by the NLRA (the substantive concern)"; (2) "the danger from the second is that the State will provide different consequences for the behavior (the remedial concern)"; and (3) "the danger from the third is that Congress's design to entrust labor questions to an expert tribunal – the NLRB – would be defeated by state tribunals exercising jurisdiction over labor questions (the primary jurisdiction concern)."  *Healthcare Ass'n of New York State, Inc., v. Pataki,* 471 F.3d 87, 94-95 (2nd Cir. 2006).  To protect against such conflicts, *Garmon* preemption prohibits states from regulating activity that the NLRA protects, prohibits, or arguably protects or prohibits.  *Wis. Dep't of Indus., Labor & Human Relations v. Gould, Inc.*, 475 U.S. 282, 286 (1986).

The purpose of *Garmon* preemption is to preserve the integrity of the "comprehensive and integrated regulatory framework" Congress established in the NLRA.  *Garmon*, 359 U.S. at 239-40.  Under the NLRA, "Congress did not merely lay down a substantive rule of law to be enforced by any tribunal competent to apply law generally to the parties."  *Garner v. Teamsters, Chauffeurs & Helpers Local Union No. 776*, 346 U.S. 485, 490 (1953).  Rather, "Congress evidently considered the NLRB, with its centralized administration and specially designed procedures, necessary to obtain uniform application of its substantive rules and to avoid these diversities and conflicts likely to result from a variety of local procedures and attitudes toward labor controversies."  *Garmon*, 359 U.S. at 239-40.

Of course, *Garmon* preemption does not apply when the activity a state seeks to regulate falls beyond the arguable reach of the NLRA.  This, however, does not mean that activities ungoverned by the NLRA can be controlled by the states.  More than indicating Congress' desire for centralized administration and uniformity in the application of its provisions, the NLRA reveals that Congress intended certain concerted activities to remain unfettered by *any* governmental interference, including the NLRB.  "Congress formulated a code whereby it outlawed some aspects of labor activities and left others free for the operation of economic forces." *Weber v. Anheuser–Busch, Inc.,* 348 U.S. 468, 480 (1955).

Thus, the Supreme Court recognized a second line of preemption analysis known as *Machinist* preemption, which forbids both the NLRB and the states from regulating conduct or activities that Congress intended to leave to "the free play of economic forces."  *Machinists v. Wis. Employment Relations Comm'n*, 427 U.S. 132, 140 (1976). *Machinists* preemption reflects the NLRA's broader purpose of restoring equal bargaining power between labor and management, and it prevents both the states and the NLRB from "picking and choosing which economic devices of labor and management shall be branded as unlawful."  *Nat'l. Labor Relations Bd. v. Ins. Agents' Internat'l. Union, AFL–CIO*, 361 U.S. 477, 498 (1960).

### 1.     Open Access to Work Act

The Trades Councils argue that the Open Access to Work Act is preempted under both *Garmon* and *Machinists*.  Wasden and amici, however, raise several procedural

issues that must be addressed before reaching the merits of the Trades Councils'

challenge to the Act.

### A.    *Ex Parte Young*

As a threshold matter, the Court must decide whether Wasden is properly named

as a defendant under the *Ex Parte Young* doctrine.  This issue is intertwined with whether

the Trades Councils have standing to bring suit against him.

The Eleventh Amendment generally bars the federal courts from entertaining suits

brought by a private party against a state or its instrumentality in the absence of state

consent.  *Los Angeles Cty. Bar Ass'n v. Eu*, 979 F.2d 697, 704 (9th Cir. 1992).  A

plaintiff does not avoid this bar by naming an individual state officer as a party in lieu of

the state.  "Yet, few rules are without exceptions, and the exception to this rule allows

suits against state officials for the purpose of enjoining the enforcement of an

unconstitutional state statute."  *Okpalobi v. Foster*, 244 F.3d 405, 411 (5th Cir. 2001).

This exception relies on the fiction constructed in *Ex parte Young* – that because a

sovereign state cannot commit an unconstitutional act, a state official enforcing an

unconstitutional act is not acting for the sovereign state and therefore is not protected by

the Eleventh Amendment.  *Ex parte Young*, 209 U.S. 123, 155-56) (1908).  *Ex Parte*

*Young* mandates that a party suing a state official in challenge to an allegedly

unconstitutional statute may only seek prospective declaratory or injunctive relief, and

not relief for past violations.  "The rule of *Ex Parte Young* 'gives life to the Supremacy

Clause' by providing a pathway to relief from continuing violations of federal law by a

state or its officers."  *Los Angeles Cty. Bar Ass'n*, 979 F.2d at 704.

A plaintiff is not free to randomly select a state official to sue in order to challenge an allegedly unconstitutional statute.  Instead, *Ex parte Young* imposed a second condition on parties bringing such claims: the state officer sued must have "*some connection* with the enforcement of the allegedly unconstitutional act, or else it is merely making…the state a party."  *Ex parte Young*, 209 U.S. at 155-56 (emphasis added).  Moreover, "[t]his connection must be fairly direct; a generalized duty to enforce state law or general supervisory power over the persons responsible for enforcing the challenged provision will not subject an official to suit."  *Los Angeles Cty. Bar Ass'n*, 979 F.2d at 453.

In *Planned Parenthood of Idaho, Inc. v. Wasden,* the Ninth Circuit addressed whether General Wasden had "some connection" to the enforcement of a parental consent statute for minors' abortions.  376 F.3d 908, 920 (9th Cir. 2004).   The statute exposed physicians performing abortions on minor patients to criminal penalties if the physician failed to fulfill certain duties specified in the statute.  The Ninth Circuit held that Wasden was a proper defendant because, by law, he could "deputize himself" to enforce the statute in place of the county attorney.  *Id.* at 920.  That power gave Wasden the requisite connection between the attorney general's office and enforcement of the statute for standing purposes.  *Id.*

Here, Wasden likewise maintains that he is not a proper defendant under *Ex Parte Young* because he lacks any connection to the enforcement of the challenged statute.  But, he argues, unlike the abortion statute in *Planned Parenthood of Idaho*, the Open Access to Work Act does not contain a criminal enforcement provision.  He contends that the Act

only provides a private right of action for any interested party, and Wasden "does not fall within the identified roster of 'interested part[ies],'" as defined in Idaho Code § 44-2013(5). *Def.'s Opening Br.* at 5, Dkt. 32-1.

The Court is not convinced. The Open Access to Work Act was codified as part of Idaho's Right-to-Work Act, which contains a criminal enforcement provision:

> PENALTIES. Any person who directly or indirectly violates any provision of *this chapter* shall be guilty of a misdemeanor, and upon conviction thereof shall be subject to a fine not exceeding one thousand dollars ($1,000) or imprisonment for a period of not more than ninety (90) days, or both such fine and imprisonment.

I.C. § 44-2007 (emphasis added). The Open Access to Work Act is part of "this chapter" referenced in Section 44-2007. This provision empowers local county prosecutors to initiate criminal proceedings against such violators. Thus, under the plain language of the statute, local county prosecutors may bring criminal charges against violators of the Open Access to Work Act. Because Wasden may "deputize himself" to enforce the statute in place of the county attorney, the connection needed under *Ex Parte Young* between Wasden and enforcement of the statute exists.

Wasden argues with some force that the criminal liability provision in Section 44-2007 does not apply to violations of the Open Access to Work Act. Rather, says Wasden, the Open Access to Work Act contains a discrete remedial provision that applies exclusively to violators of that statute, and this remedial provision does not contain a criminal enforcement provision. But the language of the criminal liability provision found in Section 44-2007 of the Idaho Right-to-Work is broad enough to encompass violators of the Open Access to Work Act, which is part of that chapter; and nothing in

the Open Access to Work Act states that its violators are exempt from this criminal liability provision.  Given the plain language of the statute, the Court must conclude that the criminal liability provision applies to the Open Access to Work Act.  The question of whether this Court's jurisdiction over Wasden is proper under the doctrine of *Ex Parte Young* therefore has been answered in the affirmative:  "some connection" between Wasden and enforcement of the Open Access to Work Act exists.

This conclusion does not end the inquiry of whether Wasden is a proper defendant, however.   This question "is really the common denominator of two separate inquiries," only one of which is whether the Court's jurisdiction over Wasden is proper under the *Ex Parte Young* doctrine.  *Planned Parenthood of Idaho*, 376 F.3d at 919.  There is a second inquiry, which remains unanswered: "whether there is the requisite causal connection between [Wasden's] responsibilities and any injury that the plaintiffs might suffer, such that relief against the defendant[] would provide redress."  *Id.*  This issue is coextensive with the issue of whether the Trades Councils have standing to sue under Article III of the Constitution.

### B.    *Standing*

Article III standing "focuses on the party seeking to get his complaint before a federal court and not on the issues he wishes to have adjudicated."  *Flast v. Cohen,* 392 U.S. 83, 99 (1968).  To establish standing under Article III, the party in question must prove: (1) an injury-in-fact that is concrete and particularized, and actual or imminent; (2) a fairly traceable causal connection between the injury alleged and the conduct in dispute;

and (3) a sufficient likelihood that the relief sought will redress the injury. *Lujan v. Defenders of Wildlife*, 504 U.S. 55 5, 560–61 (1992).

With regard to the injury-in-fact requirement, "[a] plaintiff who challenges a statute must demonstrate a realistic danger of sustaining a direct injury as a result of the statute's operation or enforcement." *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298.  Where the plaintiff challenging a regulatory action is "an object of the action (or foregone action) at issue ... there is little question" that the plaintiff has been injured as a result of the government regulation.  *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–61 (1992).  For example, a party has a standing to challenge a statute that subjects him to a threat of prosecution.  *Planned Parenthood of Idaho*, 376 F.3d at 916-17.  Here, however, the Trades Councils do not allege that they have been threatened with prosecution, that a prosecution is likely, or even that prosecution is remotely possible – because they cannot.  The Open Access to Work Act only poses a direct threat to a political subdivision for noncompliance.

But even when a regulation is not directed at a party, it can be "an object" of government regulation so long as the "injury alleged, in addition to being actual and personal," is caused by the challenged action and is "likely to be redressed by a favorable decision."  *Los Angeles County Bar Ass'n*, 979 F.2d at 701 (internal quotation marks omitted).  A party seeking to invoke the court's powers must demonstrate that more than "speculative inferences" connect the injury to the challenged action.  *Id.*  And even "if causation and redressability depend upon unfettered choices made by independent actors not before the courts," it does not exclude injury produced by determinative or coercive

effect upon the action of someone else.  *Id.  See also Bennett v. Spear,* 520 U.S. 154, 169 (1997).

The Building Trades Councils have "a legally protected interest in both negotiating and enforcing a [project labor agreement]."  *Building and Const. Trades Dept., AFL-CIO v. Allbaugh*, 172 F.Supp.2d 67, 75 (D.D.C. 2001).  By discouraging political subdivisions from negotiating a project labor agreement they would otherwise seek, enforcement of the Open Access Act could therefore result in a primary injury to Building Trades Councils.  For example, should a political subdivision desiring to enter into a project labor agreement decline to negotiate such an agreement for fear that it will be criminally charged under the Open Access to Work Act, the Trades Councils' interests will be concretely affected as a result of the Act's enforcement.  While the chain of causation leading from enforcement of the Act against the political subdivision to the Building Trades Councils' injury may appear attenuated, at no point does it depend on the "unfettered choices of third parties not before the Court."  Nor is the threatened injury either "speculative" or "inchoate."

This point is illustrated by *Planned Parenthood of Idaho*.  In that case, the Ninth Circuit found that the physician had standing to challenge the allegedly unconstitutional abortion statute because he faced criminal prosecution under the statute.  376 F.3d at 916.  The court also found that the physician had standing to challenge all of the provisions of the statute – *even those that were not on their face directed toward physicians.  Id.*

In reaching this conclusion, the court reasoned that if any of the statutory provisions discouraged potential patients from seeking the physician's care, these

provisions could cause a primary injury to the physician because the patient may refuse an abortion that the physician would recommend as medically indicated. Such a decision by the patient would impact the physician's interests, both financial and professional. In its decision, the court explained its conclusion in further detail:

> [S]hould any aspect of the bypass provisions, including those not on their face directed toward physicians, prevent or chill a minor from seeking an abortion she would otherwise seek, she will not seek his care. By discouraging potential patients from engaging his services, these provisions could result in a primary injury to Weyhrich. For example, should a minor desiring an abortion decline to seek a bypass for fear that her boyfriend will be sent to prison if a judge learns that the boyfriend impregnated her, she may never consult Weyhrich and never obtain a procedure Weyhrich would recommend as medically indicated. Weyhrich's own interests, both financial and professional, in practicing medicine pursuant to his best medical judgment, are thus affected by a statutory provision that he alleges violates the federal constitutional rights of potential abortion patients.

*Id.* According to the court, "[s]uch a threatened injury in fact is neither speculative nor inchoate." *Id.* It therefore concluded that the physician had Article III standing to raise each of his challenges – even against those provisions not directed toward him.

Similarly, in this case, the Trades Councils have standing to challenge the Open Access to Work Act even though they could not criminally be prosecuted under the statute. For standing purposes, it is enough that enforcement of the Act against the political subdivisions would prevent the Trades Councils from engaging in federally protected activity. If the Court were to find the Act is preempted, the obstacle it imposes on the Trades Councils' alleged right to seek project labor agreements with the State of Idaho and its political subdivisions would be removed. And the Trades Councils' alleged injury would be redressed.

This conclusion also leads the Court to conclude that this action is ripe for review. "The constitutional component of the ripeness inquiry is often treated under the rubric of standing and, in many cases, ripeness coincides squarely with standing's injury in fact prong." *Thomas v. Anchorage Equal Rights Com'n*, 220 F.3d 1134, 1138 (9th Cir. 2000). Indeed, some legal commentators have suggested that the doctrines are often indistinguishable. *Id.* And courts, when measuring whether the litigant has asserted an injury that is real and concrete rather than speculative and hypothetical, merge the ripeness inquiry almost completely with standing. *Id.*

Here, the Court has already determined that the threat of injury stemming from enforcement of the Open Access to Work Act is neither hypothetical nor speculative. The Court has also determined that any potential injury could be redressed by a favorable ruling. "If the injury is impending, that is enough….Nothing would be gained by postponing a decision, and the public interest would be well served by a prompt resolution of the constitutionality of [the Open Access to Work Act]." *Id.* (internal quotation marks and citations omitted). *Thomas v. Union Carbide Agr. Products Co.*, 473 U.S. 568 (1985).

### C.   *Application of the Market Participant Doctrine*

While the Court has determined that this case is justiciable, it must decide yet another threshold issue before assessing the Trades Councils' preemption claims: whether the Open Access to Work Act constitutes an impermissible regulation of labor relations between employers and employees.

"A prerequisite to preemption under either *Garmon* or *Machinists* is a finding that the state or local action in question constitutes *regulation* of labor relations between employers and employees." *Alameda Newspapers, Inc. v. City of Oakland,* 95 F.3d 1406, 1413 (9th Cir. 1996). The NLRA preempts only state regulation, and not actions a state takes as a mere proprietor or market participant. *Bldg. & Constr. Trades Council of the Metro. Dist. v. Associated Builders & Contractors of Mass./R.I., Inc.,* 507 U.S. 218, 227 (1993) (" *Boston Harbor* "). Because the Court concludes that Idaho has acted as a regulator in forbidding political subdivisions from making a project labor agreement a bid condition on a public works project, the market participant doctrine does not save the Act from preemption scrutiny.

Two Supreme Court cases bookend the scope of the market participant doctrine: *Wisconsin Department of Industry v. Gould Inc.,* 475 U.S. 282 (1986), and *Boston Harbor,* 507 U.S. at 218. In *Gould*, the Supreme Court considered whether a Wisconsin statute debarring repeat labor law violators from doing business with the state was preempted under the NLRA. The Court expressed "little doubt that the NLRA would prevent Wisconsin from forbidding *private parties* within the State to do business with repeat labor law violators." *Id.* at 286-287. Wisconsin argued, however, that the statutory scheme escaped preemption because it represented an exercise of the state's spending power rather than its regulatory power. *Id.* at 287.

The Court dismissed this argument as "a distinction without a difference," finding that the statute on its face served "plainly as a means of enforcing the NLRA." *Id.* Emphasizing the "rigid and undiscriminating manner" in which the statute operated, the

Court explained that "[n]o other purpose could credibly be ascribed" given that firms charged with violating the NLRA three times were "automatically deprived of the opportunity to compete for the State's business." *Id.* at 287-288.  Because the statute flatly prohibited state purchases from repeat labor law violators, the Court found that Wisconsin was not functioning as a private purchaser of services, and "for all practical purposes, Wisconsin's debarment scheme [was] tantamount to regulation." *Id.*

In contrast, in *Boston Harbor*, the Supreme Court held that the NLRA did not preempt a state agency's bid specification requiring that any contractor working on a state-sponsored cleanup of Boston Harbor enter into a project labor agreement.  507 U.S. at 232.  The Court concluded that the state agency was acting as a proprietor, and not a regulator: "there is no question that [the state agency] was attempting to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost."  *Id.*  It also noted that "the challenged action in this litigation was specifically tailored to one particular job, the Boston Harbor cleanup project," and there was no reason to believe that the state agency was motivated by anything more than its proprietary interests.  *Id.*

Using *Gould* and *Boston Harbor* as the backdrop for the market participant analysis, the Ninth Circuit in *Johnson v. Rancho Santiago Community College Dist.* offered two questions designed to aid the determination of whether state action constitutes market participation, which it borrowed from the Fifth Circuit's decision in *Cardinal Towing & Auto Repair, Inc. v. City of Bedford,* 180 F.3d 686, 693 (5th Cir. 1999).  623 F.3d 1011, 1023 (9th Cir. 2010).  The first question asks, "does the

challenged action essentially reflect the entity's own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances?"  The second asks in the alternative, "does the narrow scope of the challenged action defeat an inference that its primary goal was to encourage a general policy rather than address a specific proprietary problem?"

The second question *Cardinal Towing* poses does not apply here.  That is because "[t]he second question looks to the *scope* of the expenditure and protects narrow spending decisions that do not necessarily reflect a state's interest in the efficient procurement of goods or services, but that also lack the effect of broader social regulation."  *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 660 F.3d 384, 398 (9th Cir. 2011).  In general, "'[n]arrow spending decisions' tend to be expressly limited in time and scope—for example, they apply to one city contract or to a number of contracts of a particular size and funded by a particular finite source."  *Id.* at 399.

For example, in *Rancho Santiago*, the Ninth Circuit found that a project labor agreement between a community college and labor union that "could be characterized as covering the single project of improving campus facilities" was sufficiently narrow in scope to qualify for the market participation exemption.  623 F.3d at 1028-29.  The agreement only applied to construction projects for campus improvement projects costing over $200,000 and for a three-year period, and funded by a specific initiative.  Here, however, the Open Access to Work Act applies to *all* public works projects – it is not limited to projects of a particular size, a particular time period, or a particular funding source.  These factors indicate that the Act does not fall within the narrow scope prong.

*American Trucking Ass'ns, Inc.*, 660 F.3d at 399 (holding that concession agreement that applied to all operations, regardless of size, funding source, or time frame were not "narrow spending decisions").

The Court must therefore consider whether the Act reflects the state's "own interest in its efficient procurement of needed goods and services, as measured by comparison with the typical behavior of private parties in similar circumstances." *Id.* The focus of this inquiry is on whether the state is making procurement decisions in a similar manner to a private party participating in the market. In *Boston Harbor*, the Supreme Court determined that the state acted as a market participant when it required that all contractors enter into a project labor agreement on a specific project in order "to ensure an efficient project that would be completed as quickly and effectively as possible at the lowest cost." 507 U.S. at 232.

This case, however, presents a more difficult question because it involves a blanket rule that applies to all public construction projects. On first review, it seems the D.C. Circuit's holding in *Building Trades v. Allbaugh* resolves this quandary. 295 F.3d 28 (D.C. Cir. 2002), *cert. denied,* 537 U.S. 1171 (2003). In *Albaugh*, the court held that the use of a blanket rule made no difference. *Id.* at 34. That case involved an Executive Order that barred all federal agencies and any entity receiving federal assistance for a construction project from either requiring bidders or contractors to enter, or prohibiting them from entering, into a project labor agreement. The court concluded that the Executive Order embodied just "the type of decision regarding the use of labor agreement that a private project owner would be free to make." *Id*. at 35 (citation omitted). The

court in *Albaugh* reached this conclusion despite the fact that the Government had acted through a blanket rule.  According to the *Albaugh* court, creating a blanket rule regarding use of project labor agreements on government projects was not inconsistent with the action of a proprietor.  *Id.*

But this case differs from *Albaugh* in one critical respect.  The Executive Order in *Albaugh* stated that its principal purpose was to promote "the economical, nondiscriminatory, and efficient administration and completion of Federal and federally-funded or assisted construction projects . . . ." 66 Fed. Reg. at 11,225.  By contrast, the Open Access to Work Act "on its face does not purport to reflect [Idaho's] interest in the efficient procurement of goods and services."  *Chamber of Commerce of the United States v. Lockyer*, 463 F.3d 1076, 1084 (9th Cir. 2006) (*en banc*), *rev'd on other grounds sub nom. Chamber of Commerce v. Brown*, 554 U.S. 60 (2008), *vacated by* 543 F.3d 1117 (2008).  Instead, the Senate Bill 1006's preamble makes clear that the statute's purpose relates to the right to work; and Section 1 of Senate Bill 1006 states that the legislature enacted the Act "to maintain and strengthen state law to protect open access to work for all Idahoans."

On this basis, the Open Access to Work Act more closely approximates the statutes in *Lockyer* than the Executive Order in *Albaugh*.  In *Lockyer*, the Ninth Circuit held that California was not acting as a market participant when it enacted a statute forbidding certain employers receiving state funds from using those funds to assist, promote, or deter union organizing.  464 F.3d at 1080.  To reach this conclusion, the court noted that the statute "on its face" did not purport to reflect California's interest in

the efficient procurement of goods and services.  "Rather," the court explained, "the statute's preamble makes clear that the legislation's purpose is to prevent 'state funds and facilities' from being used to subsidize an employer's attempt to influence employee choice about whether to join a union."  *Id* . at 1084.  Because the statute on its face sought to regulate labor relations rather than the efficient procurement of goods and services, and also because it swept broadly, applying to all employers in California receiving state funding, the Court found the statute was a regulatory measure that fell outside the market participant exception.

Similarly in this case, because the Open Access to Work Act, like the statute in *Lockyer* and unlike the Executive Order in *Albaugh*, makes clear that its purpose is not to further the state's interest in the efficient procurement of goods and services but rather to further Idaho's Right-to-Work Act, the Court concludes that the statute is a regulatory measure.  It is therefore not exempt from preemption scrutiny.

Wasden's slightly different cast on the traditional market participant analysis does not change the Court's conclusion.  Wasden seeks to distinguish *Gould* and *Boston Harbor* on the grounds that the state activity at issue in those cases involved the regulation of private parties while the Open Access to Work Act "'regulates' at most, political subdivisions."  *Def's Opening Br.* at 13, Dkt. 32-1.  "*A fortiori*," he says, "no "pretext of 'regulation' as that term was used in *Gould* and *Boston Harbor* exists."  *Id.*

This is a false distinction.  *Gould*, like this case, involved a statute that only purported to proscribe conduct by state procurement agents.  475 U.S. at 283-84.  However, as already discussed, the Supreme Court rejected the state's argument that the

statute escaped preemption because it regulated the state's spending powers only. Focusing instead on the purpose of the statute, the Court held that the NLRA preempted the state law even though the law constrained only the state's participation in the market. *Id.* at 287.

Similarly, in this case, simply because the Open Access to Work Act purports to regulate only political subdivisions, it does not preclude answering the question whether the Act also interferes with employee rights protected by the NLRA. *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 109 (1989) (holding the NLRA "creates rights in labor and management both against one another and against the State"). Indeed, this is the very question that preemption analysis seeks to answer. And to accomplish this, the Court must look beyond what entity the Open Access to Work Act "regulates" to understand what impact the statute has on private parties, who are promised protection from government interference with their NLRA rights.

### D.    *NLRA Preemption*

The Court's conclusion that the Open Access to Work Act is not exempt from preemption scrutiny does not mean that it is in fact preempted by the NLRA. Indeed, the Supreme Court has instructed the lower courts to use caution in inferring preemption. *Boston Harbor,* 507 U.S. at 224. "Consideration under the Supremacy Clause starts with the basic assumption that Congress did not intend to displace state law." *Id.* (quoting *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981)). While heeding the Supreme Court's admonition, the Court nevertheless finds that the Act is preempted.

### (1)    *Garmon Preemption*

Preemption by actual conflict exists when "compliance with both federal and state regulations is a physical impossibility," or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Brown v. Hotel & Rest. Employees & Bartenders,* 468 U.S. 491, 501(1984).  "If employee conduct is protected under Section 7 of the NLRA, then state law which interferes with the exercise of these federally protected rights creates an actual conflict and is preempted by direct operation of the Supremacy Clause." *Id.*

Section 7 of the NLRA protects an employee's right to engage in concerted activities for the purpose of collective bargaining and other mutual aid and protection.  29 U.S.C. § 157.  Here, the question is whether the Open Access to Work Act interferes with employees' right to secure project labor agreements – a form of concerted activity protected under Section 7.

A project labor agreement has been described as "a pre-hire agreement between a construction project owner and a union or unions that a contractor must agree to before accepting work on the project and that establishes the terms and conditions of employment for the project." *Rancho Santiago*, 623 F.3d at 1017.  Such agreements are not uncommon in the construction industry, because "the short-term nature of employment impedes post-hire collective bargaining, and where contractors need predictable costs and a steady supply of skilled labor." *Id.*  To ensure that a project labor agreement achieves the parties' objectives, all contractors on the project must become parties to the agreement.  For this reason, the bid specifications for a project often require

that all contractors agree to the project labor agreement.  *Boston Harbor*, 507 U.S. at 232-33.

The Open Access to Work Act, however, prohibits a state agency or political subdivision from requiring that a contractor on a public works project become a party to a project labor agreement "as a condition of bidding, negotiating, being awarded or performing work on a public works project."  I.C. § 44-2013(4).  The Act also forbids the State and its political subdivisions from designating the wages and benefits their contractors and subcontractors will pay on public works projects.  This prohibition prevents construction workers throughout the state from ever seeking project labor agreements with the State and its political subdivisions, effectively precluding the use of such agreements on public works projects with the State.  But Sections 8(e) and (f) of the NLRA explicitly permit employers in the construction industry to enter into prehire agreements.  29 U.S.C. § 158(e) and (f).  Idaho therefore, by enacting the Open Access to Work Act, has erected an impermissible obstacle to the right to bargain project labor agreements on public works projects.

Although Sections 8(e) and (f) do not apply specifically to the State,[1] "the general goals behind passage of §§ 8(e) and (f) are still relevant to determining what Congress intended with respect to the State and its relationship to the agreements authorized by

_____

[1] The NLRA specifically exempts the States from the definition of "employer."  29 U.S.C. § 152(2)

these sections." *Boston Harbor*, 507 U.S. at 231.  And as discussed above, it does not matter if the Act only purports to regulate political subdivisions if it also blocks employees from engaging in concerted activity protected under the NLRA.  Because the NLRA and the Open Access to Work Act "cannot move freely within the orbits of their respective purposes without impinging upon another," state jurisdiction must yield.  *Hill v. Florida ex rel. Watson*, 325 U.S. 538 (1945).

*(2)     Machinists Preemption*

Even if the Open Access to Work Act were not preempted under *Garmon*, it would be preempted under *Machinists*.  *Machinists* preemption preserves Congress' "intentional balance between the uncontrolled power of management and organized labor to advance their respective interests in negotiating the terms and conditions of employment."  *Lockyer*, 463 F.3d at 1087 (quoting *Boston Harbor,* 507 U.S. at 226) (internal quotation marks omitted).  "The States have no more authority than the Board to upset the balance that Congress has struck between labor and management in the collective-bargaining relationship."  *Id.* at 1086 (quoting *Golden State Transit Corp. v. City of Los Angeles,* 475 U.S. 608 (1986).  More recently, *Machinists* has been used "to determine the validity of state rules of general application that affect the right to bargain or to self-organization." *Metropolitan Life Ins. Co. v. Massachusetts*, 471 U.S. 724, 749, fn. 27. (1985).

In this case, the Open Access to Work Act's blanket prohibition against the use of project labor agreements on public works projects restricts Congress' intended free play of economic forces identified in *Machinists*.   In enacting Section 8(e) and (f), Congress

established the parameters within which construction employers and unions could bargain, influenced only by their own economic power, and the "free play of economic forces." The Act skews those forces by robbing unions of the opportunity to even seek a project labor agreement on a public works project.

A public entity when acting as a "*purchaser*" also should be permitted to "choose a contractor based upon that contractor's willingness to enter into a prehire agreement" to the same extent as a private purchaser. *Boston Harbor*, 507 U.S. at 231. As the Supreme Court suggested in *Boston Harbor*, "denying an option to public owner-developers that is available to private owner-developers itself places a restriction on Congress' intended free play of economic forces identified in *Machinists.*" *Id.* at 231. Because the Act upsets the balance Congress struck "between the uncontrolled power of management and organized labor to advance their respective interests in negotiating the terms and conditions of employment," *id.* at 226, it conflicts with the NLRA based on the principles espoused in *Machinists.*

Amicus NRTW counters that permitting the states to interfere with the collective bargaining process by imposing project agreements on private employers and employees turns *Machinists* "on its head." *Amicus Br.* at 2, Dkt. 29-1. This argument ignores the Supreme Court's explanation in *Boston Harbor* that project labor agreements are "the very sort of labor agreement that Congress explicitly authorized and expected frequently to find" in the construction industry. 507 U.S. at 233. And when a public entity, acting as a proprietor, conditions its purchasing on a project labor agreement, it "exemplifies" the "workings of the market forces Congress expected to find." *Id.* Thus, *never* allowing

a state agency or political subdivision, acting in the role of purchaser of construction services, to choose to use a project labor agreement on a public works project interferes with the very market forces Congress intended to leave unregulated. *Id.*

The Court acknowledges that the State and its political subdivisions may never decide to use a project labor agreement on a public work project. But this is a choice they should be allowed to make based on their assessment of the best and most efficient use of government funds on a particular project – free from the handcuffs of the flat prohibition mandated by the Open Access to Work Act. There was no evidence that the Idaho legislature enacted the Open Access to Work Act to advance the State and its political subdivisions' "proprietary goals" in procuring construction services. Instead, the Court agrees that the Act "is an unabashed expansion of the State's Right-to-Work Act, intended to regulate construction industry project labor agreements." *Pl.'s Resp.* at 30, Dkt. 50.

Because the State seeks to regulate what Congress intended to remain unregulated, the Open Access to Work Act is preempted under *Machinists.*

## 2.    **Fairness in Contracting Act**

### A.    *Garmon Preemption*

The Fairness in Contracting Act is facially invalid because there is "no set of circumstances" under which the Act would not be preempted. *U.S. v. Salerno*, 481 U.S. 739, 745 (1987). This Court found in its decision preliminarily enjoining the Act under *Garmon* preemption principles that (1) every application of the Act will reach conduct that is either "actually" or "arguably" preempted by the NLRA; and (2) to the extent the

conduct it bars is only "arguably" preempted, the Act does not fall within an exception to *Garmon*. *Memorandum Decision and Order* at 9-17, Dkt. 23. The Court finds no reason to deviate from its earlier decision.

State regulation is presumptively preempted by the NLRA when it concerns conduct that is actually or arguably either protected or prohibited by the NLRA. *Belknap, Inc. v. Hale*, 463 U.S. 491, 498 (1983). First, states must yield to the National Labor Relations Board's exclusive jurisdiction over conduct "actually" protected or prohibited under Sections 7 or 8 of the NLRA. *Garmon*, 359 U.S. 243. If the state law regulates conduct actually protected by federal law, preemption follows as a matter of substantive right. *Brown v. Hotel & Restaurant Employees & Bartenders Int'l. Union Local 54*, 468 U.S. 491, 501-503 (1984). Second, "[w]hen an activity is arguably subject to § 7 or § 8 of the [NLRA], the States as well as the federal courts must defer to the exclusive competence of the National Labor Relations Board if the danger of state interference with national policy is to be averted." *Garmon*, 359 U.S. at 245.

Unlike the "actually protected" preemption rule, which is categorical, the "arguably" protected rule is subject to exception in limited circumstances: (1) the NLRA does not preempt state action that regulates activity of "a merely peripheral concern" to the Act; and (2) the NLRA does not preempt state action "where the regulated conduct touche[s] interests so deeply rooted in local feeling and responsibility," it cannot be inferred that Congress intended to deprive states of the power to act. *Id.* at 243-44.

Everyone agrees here that most job targeting programs are "actually" protected under the NLRA. *In re Manno Elec., Inc.*, 321 NLRB 278, 298 (1996). The Attorney

General, however, reprises his argument that a certain class of market recovery programs – those that are partially funded by dues exacted from employees working on projects subject to the Davis-Bacon Act – is neither actually nor arguably protected under Section 7. Wasden points to a series of administrative and federal court decisions holding that the Davis-Bacon Act bars wage deductions pursuant to job targeting programs on public work projects. *See NLRB v. IBEW Local 48*, 345 F.3d 1049 (9th Cir. 2003)*; IBEW Local 48 (Kingston Constructors, Inc.)*, 332 N.L.R.B. 1492, 1502 (2000).

In *IBEW Local 48,* for example, the Ninth Circuit enforced an NLRB order finding a union's attempts to require payment of market recovery program dues on Davis-Bacon projects was unlawful. 345 F.3d at 1058. The Davis-Bacon Act requires that workers on certain government projects receive the prevailing wage "without subsequent deduction or rebate." 40 U.S.C.A. § 276(a). But unions often fund market recovery programs by requiring union contractors subject to the Davis-Bacon Act to deduct a percentage of workers' wages, which they forward to the union for use in subsidizing bids for targeted contractors. *Id.* The NLRB has found that such deductions violate the Davis-Bacon anti-kickback provision, and therefore are "inimical to public policy." *Id.*

The Court agrees that a question exists whether market recovery programs lose Section 7 protection when funded with dues paid by employees working on Davis-Bacon jobs. However, this question has not been definitively answered.

In *Can-Am Plumbing, Inc. v. NLRB,* the D.C. Circuit reviewed a NLRB decision finding that a nonunion construction contractor violated the NLRA by filing and

maintaining a state court lawsuit concerning a union's job targeting program that was preempted by the Act.  321 F.3d 145 (D.C. Cir. 2003).  The court found that the Board's "conclusory findings that these moneys did not taint the job targeting program [were] inadequate to support its determination that the operation of the program as a whole was protected conduct under section 7."  *Id.* at 146.  However, upon remanding the case to the Board, the D.C. Circuit acknowledged that the Board could conclude that the job targeting program, even if "tainted" by Davis-Bacon funds, did not lose its protected status under Section 7: "Additional evidence may also provide support for the Board's conclusion that the Union's conduct is excusable or makes no difference to the Board's section 7 determination. Thus, the Board on remand may yet determine that the JTP is protected under section 7."  *Id* at 153-54.

On remand, the original petitioners submitted additional evidence and arguments to the Board to support their conclusion that job targeting is protected concerted activity under Section 7 even if the program uses funds collected from workers employed on Davis-Bacon jobs.  Absent any authority finding that the inclusion of dues from Davis-Bacon projects rendered a job targeting program unprotected by the NLRA, the petitioners argued that the source of job targeting funds has nothing to do with whether the job targeting programs aimed to "protect employees jobs and wage scales" – activity that falls squarely within the protections of Section 7.  However, the NLRB never considered the petitioners' argument; it found instead that the nonunion contractor had waived the issue by not raising it in the original hearing and affirmed its previous

decision finding that the nonunion contractor had violated the NLRA by prosecuting its preempted lawsuit.

Even though the NLRB has never directly addressed whether job targeting programs that rely on Davis-Bacon project wages retain their protected status under Section 7, this Court finds that valid arguments exist supporting this conclusion. A party claiming preemption based on arguably protected conduct must only show that its case is one that the NLRB could legally decide in its favor. *International Longshoremen's Association v. Davis*, 476 U.S. 380, 395 (1986). To meet this burden, the party claiming preemption "must advance an interpretation of the [NLRA] that is not plainly contrary to its language and that has not been 'authoritatively rejected' by the courts or the Board." *Id.* ( internal citations omitted). Because the Trades Councils have advanced a viable argument that job targeting programs using wages collected from Davis-Bacon projects retain their protected status, and because this argument "has not been 'authoritatively rejected' by the courts or the Board," they have therefore satisfied their burden of establishing that job targeting programs are "arguably protected" activity.

As explained in *Garmon*, absent "the Board's clear determination that an activity is neither protected nor prohibited or of compelling precedent applied to essentially undisputed facts, it is not for this Court to decide whether such activities are subject to state jurisdiction." *Garmon*, 359 U.S. at 244-46. Courts are not primary tribunals to adjudicate such issues. *Id.* at 244. Rather, *Garmon* mandates "that these determinations be left in the first instance to the National Labor Relations Board" to preserve the

integrity of the "comprehensive and integrated regulatory framework" Congress established in the NLRA.  *Garmon*, 359 U.S. at 239-40.

>    **B.**    ***Exceptions to Garmon Preemption***

Both Wasden and Amicus IP ABC suggest that even if the conduct alleged is arguably protected by the NLRA, this is not a case in which preemption should be applied.

>    *(1)    Application of Section 14(b)*

Amicus IP ABC contends that NLRA Section 14(b), 29 U.S.C. §164(b), exempts the Anti-Job Targeting Act from preemption because the Act is part of Idaho's Right-to-Work law.  IPC ABC describes Idaho's Right-to-Work law as "legislation that goes far beyond merely proscribing union security provisions requiring union membership for its citizens to work."  *IPC ABC Opening Br.* at 13, Dkt. 35.  The Court disagrees.

Section 8(a)(3) of the NLRA permits unions and employers to negotiate union security agreements, i.e., agreements that "require as a condition of employment, membership in the labor organization."  29 U.S.C. § 158(a)(3).  "Membership," for purposes of Section 8(a)(3), means only the obligation to pay initiation fees and dues.  *NLRB v. General Motors,* 373 U.S. 734, 742 (1963).

Conversely, Section 14(b) allows states to, in essence, opt out of Section 8(3) by enacting right-to-work laws which ban "agreements requiring membership in a labor organization as a condition of employment."  29 U.S.C. § 164(b).  Section 14(b) can best be described as an exception to the general rule that the federal government has preempted the field of labor relations regulation.  *See, e.g.*, *Retail Clerks Int'l v.*

*Schermerhorn*, 375 U.S. 96, 99-102 (1963).  It makes "clear and unambiguous the purpose of Congress not to preempt the field . . . 'in this regard so as to deprive the states of their powers to prevent compulsory unionism.'" *Id.*, at 101, 101 n. 9 (quoting H.R.Rep.No.510, 80th Cong., 1st Sess., p. 60).

But state right-to-work laws cannot be construed to prevent concerted activity protected under Section 7 not properly reserved to state regulation by Section 14(b).  For example, Section 14(b) does not permit states to prohibit collectively-bargained arrangements such as a union-operated referral system simply because the state perceives such arrangements as unduly encouraging union membership or contravening an individual's "right-to-work."  *N. L. R. B. v. Tom Joyce Floors, Inc.*, 353 F.2d 768, 770 - 771 (9th Cir. 1965).

IPC ABC's argument therefore raises the question whether "job targeting programs" are a form of "compulsory unionism" that Section 14(b) allows states to prohibit.  Nothing about a job targeting program, however, makes union membership compulsory.  Because Idaho is a right-to-work state, membership in any local in Idaho is entirely voluntary.  *Clay Decl.* ¶ 11, Dkt. 2-2.  While union contractors agree to hire only through the hiring halls operated by the locals, non-members are permitted to use the hiring halls and sometimes do.  *Id.*; *Moore Decl. ¶ 6, Dkt. 2-3.*  And only union members must pay the special assessment that the locals use to fund their job targeting programs.  Members choose to pay this special assessment through a membership vote.  *Moore Decl.* ¶ 6, Dkt. 2-3.  The members approve a job targeting program and agree to fund it out of

their own wages despite knowing that the program may benefit members and non-members alike. *Id.*

By contrast, IPC ABC presents no evidence that job targeting programs force employees to choose between joining a union and facing termination of their employment. There is no evidence that employees must join unions to work on a job supported by a job targeting program. Job targeting programs do not require an employer receiving wage supplements to hire only union workers. Nor is there evidence that such employers choose to, or are somehow required to, violate the nondiscrimination provisions of the NLRA or Idaho's Right-to-Work law by hiring only union employees. Thus, contrary to IPC ABC's suggestion, there is no proof that job targeting programs "drive from employment all persons who cannot or will not participate in unions." *IPC ABC Resp. Br.* at 5, Dkt. 48.

IPC ABC counters that because job targeting programs help generate employment opportunities for union members, such programs force nonunion workers to choose between joining a union and sitting at home with no work. But as just noted, employers on targeted jobs are not required to hire union members exclusively. Conversely, nonunionized employees are not required to join a union as a condition of working for a union employer who used job targeting funding to win the project bid. So, contrary to IPC ABC's suggestion, a union employer winning a project bid through the use of job targeting funding does not automatically mean that a nonunionized worker is left only with the option of sitting at home or joining a union.

In other words, attempts to enhance employment opportunities for unionized employees through programs that lower labor costs for unionized employers does not transform voluntary unionism into compulsory unionism. At most, enhancing employment opportunities for union workers merely encourages union membership. And protected employee conduct, even in a right-to-work state, includes attempts to encourage union membership so long as it is not achieved through discriminatory means. *See, e.g., Teamsters Local v. Labor Bd.*, 365 US 667, 675-76 (1961) (explaining that union benefits, such as hiring halls, are not unlawful merely because they "encourage union membership"). Just as exclusive but nondiscriminatory hiring halls do not fall within the ambit of Section 14(b), *Tom Joyce Floors, Inc.*, 353 F.2d at 770 -771, neither do job targeting programs.

### (2)      *Local Interest Exception*

In the alternative, IPC ABC argues that Idaho has a deeply rooted state interest against "compulsory unionism," which outweighs the "peripheral" federal interest in protecting job targeting programs. This argument is flawed for several reasons.

First, protecting job targeting programs is not merely a "peripheral" federal concern. Job targeting programs constitute actually, or at least arguably, protected activity under Section 7, and preventing state interference in employees' right to engage in concerted protected activity lies at the core of NLRA concerns. Also, the fact that certain job targeting programs may only be "arguably protected" has nothing to do with "deeply-rooted" state concerns, but rather with the Davis-Bacon Act – a federal statute.

**MEMORANDUM DECISION AND ORDER - 34**

Second, as described above, there is no proof that job targeting programs promote "compulsory unionism." Workers choose to be union members. Workers choose, through a membership, to fund job targeting programs. Employers choose to enter into pre-hire agreements that allow them to participate in job targeting programs. And employers receiving job targeting funds choose whether to hire union or nonunion workers through nondiscriminatory hiring halls. This is not compulsion.

Given the Court's finding that job targeting programs do not raise concerns of "compulsory unionism," the Court finds no basis to conclude that undermining union-sponsored market recovery programs falls within the category of claims "touch[ing] interests deeply rooted in local feeling and responsibility." *Belknap*, 463 U.S. at 498. These cases have most often involved threats to public order such as violence, threats of violence, intimidation and destruction of property. *See, e.g., Machinists*, 427 U.S. at 136. The Supreme Court has extended this exception to cover acts of trespass, *see Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 190-98 (1978), and certain personal torts, such as intentional infliction of emotional distress and malicious libel, *see Farmer v. United Broth. of Carpenters, Local 25*, 430 U.S. 290, 297 (1977) (listing types of cases where exception applied). "These exceptions in no way undermine the vitality of the pre-emption rule." *Farmer*, 430 U.S. at 297.

In this case, IPC ABC has cited no authority supporting its argument that prohibition of market recovery programs is an area "traditionally subject to state regulation." *Sears*, 436 U.S. at 188. To the contrary, regulation of union-sponsored market recovery programs is an area of particular concern to the NLRA. But even were

the Court to conclude that the issue presented is one of particular state concern, the

Supreme Court has cautioned that in such circumstances, any state concern must be

balanced against the risk that the exercise of state jurisdiction over the tort claim would

interfere with the regulatory jurisdiction of the NLRB:

> The critical inquiry ... is not whether the State is enforcing a law relating specifically to labor relations or one of general application but whether the controversy presented to the state court is identical to (as in *Garner*) or different from (as in *Farmer*) that which could have been, but was not, presented to the Labor Board. For it is only in the former situation that a state court's exercise of jurisdiction necessarily involves a risk of interference with the unfair labor practice jurisdiction of the Board which the arguably prohibited branch of the *Garmon* doctrine was designed to avoid.

*Sears,* 436 U.S. at 197.

Here, a state court presented with a claim under the Fairness in Contract Act

would have to decide, first, whether the challenged market recovery program derived

funds from Davis-Bacon project, and second, whether the program in question was

nonetheless protected under the NLRA before it could reach the issue of whether the

defendant contractor or union had violated the Act.  Such issues could form the basis of

an unfair labor practice charge before the Board.  This creates a risk of conflicting rulings

from the state court and the Board, and threatens state interference with the NLRB's

enforcement of national labor relations policy. *See Jones*, 460 U.S. at 682 (state claim

preempted where fundamental element of claim also had to be proved to make out a case

under § 8(b)(1)(B) of the NLRA).

Because the conduct that the Fairness in Contracting Act seeks to regulate would

overlap with NLRB issues, this case is distinguishable from *Sears*.  In *Sears*, the

employer filed a trespass action in state court in an effort to end the union's picketing on its property. The Supreme Court rejected the union's claim that the action was preempted, noting that the controversy regarding the location of the picketing was unrelated to the issue Sears might have presented to the Board.  To make out a state-law claim of trespass, Sears needed only to prove the location of the Union's picketing.  An unfair labor practice charge, on the other hand, would have focused on the objectives of the picketing – an issue "completely unrelated to the simple question whether a trespass had occurred." 436 U.S. at 198.  Thus "permitting the state court to adjudicate Sears' trespass claim would create no realistic risk of interference with the Labor Board's primary jurisdiction to enforce the statutory prohibition against unfair labor practices." *Id.*  Such is not the case here; because the issues that a state court and the Board would have to consider overlap, the risk of conflicting rulings and interference with Board enforcement of national labor policy is evident.

### (3)    *Filing of Complaint*

The Court again rejects Wasden's argument, raised during the earlier hearing on injunctive relief, that NLRA primary jurisdiction does not preempt state regulation until and unless the NLRB General Counsel files a complaint.   In reprising this argument, Wasden maintains that the Building Trades Council failed to meet its burden of establishing that job targeting programs funded in whole or part by Davis-Bacon funds are "arguably protected."  *Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 206 (1978).   But, as discussed previously, the Court has found that the Building Trades Council has met this burden.  The Court further finds that

enforcement of the Fairness in Contracting Act poses a real danger of interfering with the protections afforded by Section 7 because the Building Trades Council has presented a sufficiently strong argument that job targeting programs are protected.  Thus, the Court concludes that the Fairness in Contracting Act is preempted, even in the absence of Board Action.  *C.f., Sears, Roebuck & Co. v. San Diego County Dist. Council of Carpenters*, 436 U.S. 180, 206 (1978)

This conclusion is supported by the Ninth Circuit's decision in *Bud Antle, Inc. v. Barbosa*, 45 F.3d 1261, 1269 (9th Cir. 1994).  While *Bud Antle* did not involve the exact issues at play here, it remains instructive.  In *Bud Antle*, the Ninth Circuit held that "a private party may seek injunctive relief against the enforcement statute scheme on the ground of federal preemption" even absent Board action and despite the fact the state defendant was neither an employer nor employee able to initiate unfair labor practice proceedings.  This holding suggests that a federal court need not wait for Board action before finding that regulation of an arguably protected or prohibited activity is preempted.

### C.   *Conclusion*

Having determined that the claim at issue here (1) involves activity that is actually or arguably protected by the NLRA; (2) does not involve an issue deeply rooted in local feeling and responsibility; and (3) would risk substantial interference with the jurisdiction of the NLRA were it litigated in the state courts, the Court concludes that summary judgment should be granted in favor of the Building Trades Council on the grounds that the Fairness in Contracting Act is preempted.

## ORDER

**IT IS ORDERED:**

1.      The Trades Councils' Motion for Summary Judgment (Dkt. 31) is

   **GRANTED.**

2.      Wasden's Motion for Summary Judgment (Dkt. 32) is **DENIED**.


DATED: December 22, 2011

B. Lynn Winmill
Chief Judge
United States District Court